UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
UNITED STATES OF AMERICA, :
:
v. : **MEMORANDUM & ORDER**
: 19-CR-161 (WFK)
GONZALO ORTIZ, :
:
Defendant. :
---------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On November 29, 2021, Gonzalo Ortiz ("Defendant") pled guilty, pursuant to a plea agreement, to Count One of a five-count Indictment charging him with Investment Adviser Fraud in violation of 15 U.S.C. §§ 80b-6 and 80b-17. The Court now sentences Defendant and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is hereby sentenced to a term of 30 months of incarceration, 2 year(s) of supervised release with special conditions, restitution in the amount of $224,500, forfeiture in the amount of $275,500, and a $100 mandatory special assessment.

**BACKGROUND**

On March 28, 2019, the Government filed a five (5) count Indictment against Defendant charging Defendant with Investment Adviser Fraud (Count One) in violation of 15 U.S.C. §§ 80b-6 and 80b-17, (2) Wire Fraud (Counts Two through Four) in violation of 18 U.S.C. § 1343, and (3) Attempt to Obstruct an Official Proceeding (Count Five) in violation of 18 U.S.C. § 1512(c)(2). ECF No. 1. On November 29, 2021, Defendant pled guilty to Count One of the Indictment pursuant to a plea agreement. Plea Agreement, ECF No. 40.

The Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

**DISCUSSION**

**I. Legal Standard**

18 U.S.C. § 3553 outlines the procedures for imposing a sentence in a criminal case. A sentencing court must also consider the Sentencing Guidelines in addition to the seven 18 U.S.C. § 3553(A) factors when making a sentencing decision, although the Guidelines are only advisory. *United States v. Booker,* 543 U.S. 220, 264 (2005). *See also United States v. Kimbrough,* 552 U.S. 85 (2007).

The Guidelines range is the "starting point and the initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id* at 49. In this regard, the Guidelines provide "the framework for sentencing" and "anchor… the district court's discretion." *Molina-Martinez v. United States,* 136 S. Ct. 1338, 1346 (2016) (internal reference and quotation marks omitted).

If and when a district court imposes a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing or varying "in a statement of reasons form." *Id.* "The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.).

This Court has considered the applicable Guidelines range as well as the seven factors listed in Section 3553(a). *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005). It addresses each in turn.

## II. Analysis

**A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

**1. Family and Personal Background**

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Defendant was reared under upper-middle class economic circumstances, devoid of any form of abuse. Presentence Investigation Report ("PSR") at ¶ 56, ECF No. 47. He was born on July 31, 1973 in Posadas, Argentina to the marital union of Gabriel Ortiz (deceased) and Maria Ortiz, and has one sibling, Caesar Gabriel Ortiz. *Id.* at ¶¶ 54-55. Defendant remains close with his mother and brother, who both still live in Argentina. *Id.* at ¶ 54-55. Unfortunately, Defendant's father died when Defendant was 14 years old from injuries sustained during a fall their home, which Defendant witnessed. *Id.* at ¶ 54.

Defendant recalled having a mostly "perfect" childhood. *Id.* at ¶ 56. He remained in Argentina until adulthood and remained in the country for the duration of his schooling, which is to say, through high school. *Id.* at ¶ 67. In 1998, Defendant immigrated to the United States and settled in New Jersey. *Id.* at ¶ 57. Soon thereafter, he began dating Evelyn Campos. *Id.* at ¶ 58. The two later married in February 2000. *Id.* at ¶ 58.

To this day, Defendant and Mrs. Ortiz (née Campos) remain married and have three children together. *Id.* at ¶ 58. All of Defendant's children are students and continue to reside at the family home. *Id.* at ¶ 60.

**2. Educational and Employment History**

Defendant has worked as a carpenter since he arrived in the United States. *Id.* at ¶ 72. Between 2013 and 2019, Defendant was self-employed. *Id.* at ¶ 71. In 2020 [?], Defendant and

his wife began operating their own carpentry business. *Id.* at ¶ 68. Aside from his period of incarceration between November 2021 and May 2022, and the months immediately following his release, Defendant has worked for his business since its inception. *Id.* at ¶ 68.

### 3. <u>Prior Convictions</u>

Despite having a relatively steady stream of employment, Defendant's adult life has not been transgression-free. His criminal record is extensive. *Id.* at ¶¶ 39-47.

Defendant has a total of nine prior misdemeanor convictions for driving while intoxicated or without a license. *Id.* at ¶¶ 39-47. In the two most recent instances of this, on October 13, 2019 and January 23, 2020, Defendant was arrested for driving after a license suspension, *id.* at ¶ 46, and for operating a motor vehicle during license suspension (second offense) and operating a vehicle under the influence of liquor or drugs, respectively. *Id.* at ¶ 47. As a result, on October 15, 2021, Defendant was convicted and sentenced in South Hackensack Municipal Court in New Jersey to a period of incarceration of 364 days. *Id.* at ¶ 47.

### 4. <u>Medical and Mental Health</u>

Defendant attributes much of his drinking to his childhood trauma, namely, to the untimely death of his father. *Id.* at ¶¶ 56 and 63. Defendant was only a teenager when he witnessed his father fall from the roof of their family home and ultimately die as a result. The Defendant stated this causes emotion instability, anxiety, and stress. *Id.* at ¶ 63.

Defendant admitted that his excessive alcohol consumption was a form of self-medication. *Id.* at ¶ 63. Despite this knowledge, Defendant never sought mental health treatment prior to his arrest for the instant offense. *Id.* at ¶ 63. It also remains unclear whether Defendant has resumed

mental health treatment since his release from state custody. *Id.* at ¶ 65. However, Defendant has admitted to needing help with managing his grief and learning how to properly mourn the death of his father. *Id.* at ¶ 65.

**5. Substance Abuse**

Defendant has a lengthy history of alcohol abuse. *Id.* at ¶ 63. He began drinking at the age of 14, and, by 17, he was drinking to the point of inebriation on a regular basis. *Id.* at ¶ 66. As stated above, Defendant has sustained several arrests and convictions for driving while intoxicated. *Id.* at ¶ 66. His most recent offense occurred in January 2020 while under the supervision of Pretrial Services, which led this Court to issue an order mandating Defendant attend a 21-inpatient treatment program to be followed by an outpatient substance abuse program. *Id.* at ¶ 66. Defendant attended these Court-mandated treatment programs until his incarceration for the October 2019 and January 2020 driving offenses began. *Id.* at ¶ 66.

Unfortunately, Defendant has failed to stay the course. [Sealed] On December 12, 2022 and December 30, 2022, Defendant tested positive for alcohol during drug tests administered by Pretrial Services in New Jersey. Pretrial Services Memorandum dated January 12, 2023, ECF No. 52.

6. **Nature and Circumstances of the Offense**

From April 2015 through May 2017, the Defendant purported to serve as an investment advisor to his acquaintance, John Doe, when, in actuality, Defendant had devised a scheme to defraud John Doe. Ultimately, Defendant convinced John Doe to give him control of approximately $565,000 based on material misrepresentations. Rather than investing that money

in securities on John Doe's behalf, as he claimed he would, Defendant misappropriated $224,500 of John Doe's money for personal use. PSR ¶ 5.

John Doe's First Investment

Defendant convinced John Doe he was a successful stock trader and had made profits for other individuals by trading stocks on their behalf. He offered to manage John Doe's money and, in turn, promised a return on his investments of 50 percent per year. *Id.* ¶ 6. This began on May 10, 2015 when Defendant contacted John Doe via email and identified certain securities in which Defendant would invest on his behalf. *Id.* at ¶ 7. At this time, writing in Spanish, Defendant also assured John Doe "the possibilities are very good and although it seems to be too good to be true, in the position I am I can say that it is for real." *Id.* at ¶ 7. By May 28, 2015, Defendant and John Doe had entered into a written agreement, by which John Doe gave Defendant the discretion to invest $100,000 of his money according to the following terms: Defendant would (1) repay the $100,000 investment within 365 days; (2) provide a guarantee of at least a 50 percent return on the investment (or at least $50,000 in gains from trading); and (3) return to John Doe any gains from trading up to $100,000, after which point Defendant would keep any additional gains as compensation. *Id.* at ¶ 8.

John Doe subsequently wired $100,000 from his bank account at Wells Fargo Defendant's brokerage account at E-Trade Financial Corporation ("E-Trade"). *Id.* at ¶ 8. At the time, John Doe only authorized Defendant to use the $100,000 to trade on John Doe's behalf; he did not authorize Defendant to use the funds for any other purpose, including for Defendant's personal expenses. *Id.* at ¶ 8.

Over the course of the next several weeks, Defendant contradicted John Doe's instructions numerous times. Defendant transferred approximately $25,000 of the $100,000 investment to his

personal bank account at J.P. Morgan Chase; he spent approximately $9,888 of those funds on personal expenses; and, in June 2015, he transferred approximately $45,000 to his brokerage account at Interactive Brokers. *Id.* at ¶ 9.

John Doe's Second Investment

In June 2015, Defendant and John Doe entered into a second written agreement. *Id.* at ¶ 10. Pursuant to the same terms as the parties' initial May 2015 agreement, John Doe agreed to give Defendant discretion to invest $100,000 of John Doe's money. *Id.* at ¶ 10. Later in June 2015, John Doe opened an account at E-Trade. Although this account was in John Doe's name, Defendant had the authority to access the account enabling him to make trades on John Doe's behalf. *Id.* at ¶ 11.

On June 19, 2015, John Doe wired $100,000 from his Wells Fargo account to this E-Trade account. On June 23, 2015, Defendant sent a check in the amount of $99,000 from John Doe's E-Trade account to his personal account at J.P. Morgan Chase. *Id.* at ¶ 11. Then, Defendant wired $95,000 of those funds to his personal account at Interactive Brokers. *Id.* at ¶ 11.

Defendant continued to transfer money from the account at Interactive Brokers to his personal account at J.P. Morgan Chase over the next four months. *Id.* at ¶ 11. In total, after John Doe's deposit on June 23, 2015, Defendant transferred approximately $25,000 into his personal Chase account, of which, he spent approximately $17,000 on personal expenses. *Id.* at ¶ 11. In furtherance of the fraudulent scheme, Defendant gave $8,000 back to John Doe and falsely characterized those funds as returns on John Doe's investments. *Id.* at ¶ 11. On October 25, 2015, Defendant sent John Doe an account statement falsely stating his first and second investments had generated a return of $102,464.24 from trading in three securities. *Id.* at ¶ 12. In reality, the

Defendant had misappropriated approximately $56,000 from both investments and experienced a net loss in trading. *Id.* at ¶ 12.

John Doe's Third Investment

Defendant and John Doe entered into a third agreement on November 27, 2015. *Id.* at ¶ 13. Pursuant to this agreement, John Doe invested an additional $200,000 with Defendant. *Id.* at ¶ 13. In exchange, Defendant promised to repay John Doe's investment within 180 days, on which he guaranteed at least a 50 percent return, or at least $100,000 in gains from trading. *Id.* at ¶ 13. The agreement further provided John Doe would not receive any gains above $100,000 that were generated within the first year after this investment was made; Defendant was only authorized to use this investment for trading; and Defendant could not use the funds for any other purpose, including for Defendant's personal expenses. *Id.* at ¶ 13.

On November 27, 2015, shortly after John Doe wired $200,000 to Defendant's personal account at J.P. Morgan Chase, Defendant transferred approximately $172,000 of those funds to his Interactive Brokers account, while keeping another $26,000 for his own personal use. *Id.* at ¶ 14. Then, in furtherance of the fraudulent scheme, Defendant returned $2,000 of the $200,000 investment to John Doe, and falsely advised him this sum constituted returns on his investments. *Id.* at ¶ 14. Between December 2015 and October 2016, Defendant misappropriated an additional $90,000 of John Doe's investment for his own personal use. *Id.* at ¶ 15. Defendant also transferred $20,000 back to John Doe, and again falsely advised him the money constituted returns on his investments. *Id.* at ¶ 15.

John Doe's Fourth Investment

In early 2016, on Defendant's request, John Doe opened a new E-Trade account. *Id.* at ¶ 16. In April 2016, Defendant convinced John Doe to transfer the holdings in John Doe's retirement

account at MetLife, which contained approximately $114,000, into the new E-Trade Account. *Id.* at ¶ 16. Although this E-Trade account remained in John Doe's name, John Doe gave Defendant authority to trade in this account and Defendant was, in fact, the only individual to trade in that account. *Id.* at ¶ 16.

In late 2016, Defendant falsely advised John Doe he had lost the first, second, and third investments through trading, an amount which totaled $400,000. *Id.* at ¶ 17. However, Defendant failed to tell John Doe he had stolen approximately $170,000 of those investments for personal use. *Id.* at ¶ 17. Defendant then convinced John Doe to give him an opportunity to make some of John Doe's money back. *Id.* at ¶ 17. He directed John Doe to open a brokerage account at Interactive Brokers and to authorize Defendant to make trades in that account. *Id.* at ¶ 17. In December 2016, John Doe invested an additional $50,000 with Defendant, which he deposited into John Doe's Interactive Brokers account. *Id.* at ¶ 17. Defendant assured John Doe he would not allow the account to fall below $50,000. *Id.* at ¶ 17. In exchange, John Doe allowed Defendant to withdraw from this account approximately $2,000 per month to cover his living expenses. *Id.* at ¶ 17.

Despite offering these assurances, Defendant began executing a series of "wash trades" between John Doe's Interactive Broker and E-Trade accounts. *Id.* at ¶ 18. Defendant began simultaneously selling and purchasing the same financial instruments, thereby creating misleading, artificial activity in the marketplace. *Id.* at ¶ 18. By trading the same stock between John Doe's Interactive Broker and E-Trade accounts, Defendant made it appear John Doe's Interactive Broker's account was earning substantial returns on John Doe's investment. *Id.* at ¶ 18. In reality, Defendant was using the wash trades to siphon money from John Doe's E-Trade account—which

John Doe could not monitor—into John Doe's Interactive Brokers account—which John Doe could monitor. *Id.* at ¶ 18.

Between January 2017 and May 2017, Defendant also withdrew $54,250 from John Doe's Interactive Broker's account, an amount well above the $2,000 per month John Doe had authorized. *Id.* at ¶ 18.

Altogether, between April 2015 and May 2017, John Doe gave Defendant $565,000 to invest on his behalf. Defendant repaid $30,000, claiming it was return on his investments; he misappropriated $224,500 for this own personal use, and he lost the remainder of the investments in trading. *Id.* at ¶ 18.

The Court's sentence takes into account the harm Defendant's fraudulent scheme has caused John Doe. The Defendant's scheme depleted John Doe's savings and retirement accounts. As such, there is no doubt of the significant financial hardship Defendant has caused.

**B. The Need for the Sentence Imposed**

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

In addition to taking into account the nature of Defendant's offensive conduct, the Court's sentence also seeks to deter Defendant and others from engaging in similar criminal activity, from disregarding U.S. law, and from partaking in illicit activity. Lastly, this sentence justly punishes Defendant for committing this offense and causing John Doe grave harm.

**C. The Kinds of Sentences Available**

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to Count One of the Indictment charging him with Investment Advisor Fraud in violation of 15 U.S.C. §§ 80b-6 and 80b-17. For Count One, Defendant faces a statutory maximum term of imprisonment of five (5) years. 15 U.S.C. § 80b-6 and 15 U.S.C. § 80b-17. Defendant also faces term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2). Defendant is eligible for not less than one year nor more than five years probation, 18 U.S.C. § 3561(c)(1), and one of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service. 18 U.S.C. § 3563(a)(2).

In addition to facing terms of imprisonment, supervised release, and probation, Defendant also faces a maximum fine of $10,000. 18 U.S.C. § 3571(b), and a mandatory special assessment of $100.00, 18 U.S.C. § 3013. Furthermore, restitution in the amount of $224,500 is mandatory. 18 U.S.C. § 3663A. Defendant is also subject to forfeiture pursuant to 18 U.S.C. §§ 1343 and 981(a)(1)(C).

**D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses**

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

The applicable guideline for 15 U.S.C. § 80b-6 offenses is USSG § 2B1.1(a)(2). Pursuant to Section 2B1.1(a)(2) of the Guidelines, Defendant's base-level offense is 6. A ten-level increase is warranted per USSG 2B1.1(b)(1)(F) because the loss, calculated at $224,500, involved a loss

exceeding $150,000, but less than $250,000. Two levels are added per USSG §2B1.1(b)(2)(A)(iii) because the victim in this case suffered a substantial financial hardship. An additional two-levels are added per USSG §3B1.3 because Defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense.

These upward adjustments increase Defendant's offense level to 20. This figure is reduced by two-levels due to Defendant's acceptance of responsibility, *id.* at § 3E1.1(a). It is reduced by one additional level per USSG § 3E1.1(b) because Defendant timely notified the Government of his intent to enter a plea of guilty.

In light of these adjustments, all Parties agree Defendant's total offense level is 17. The Parties also all agree that Defendant has a criminal history score of six. As detailed in the PSR, Defendant has nine misdemeanor convictions for driving while intoxicated or without a license. PSR ¶¶ 39-47. The Parties do not challenge this; nor do they dispute that these convictions result in a subtotal criminal history score of six (6). According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of six (6) establishes a criminal history category of III. PSR ¶¶ 48-49.

The Guidelines recommend the following for a defendant with an offense level of 17 and a criminal history category of III: a term of imprisonment between 30 months to 37 months; a term of supervised release between 1 year and 3 years per USSG §5D1.2(a)(2); a fine within the range of from $10,000 to $95,000 per USSG §5E1.2(c)(3); and mandatory restitution per USSG § 5E1.1. Because the applicable Guidelines range here is in Zone D, Defendant is ineligible for probation per USSG §5B1.1, comment (n.2).

The Government maintains that the Court should impose a sentence at the bottom of the Guidelines range. Government's Sentencing Memorandum ("Gov't Mem.") at 1, ECF No. 53. On the other hand, both Probation and the Defense recommend a downward departure from the Guidelines range. *See* U.S. Probation Department Sentence Recommendation ("Probation's Recommendation") at 1, ECF No. 47-1; Defendant's Sentencing Memorandum ("Def. Mem.") at 2, ECF. No. 56.

Beginning with the Government, the Government recommends the Court impose a sentence at the bottom of the Guidelines range, which, as explained, is 30 to 37 months. Gov't Mem. at 1. The Government argues a sentence at the bottom of the Guidelines range would be sufficient, but not greater than necessary, to achieve the goals of sentencing given the nature and circumstances of the offense. *Id.* at 7 (referencing 18 U.S.C. § 3553(a)(1)).

The Government states the Defendant's egregious fraudulent scheme justifies a significant custodial sentence. *Id.* at 7. As made clear by John Doe's Victim Impact Statement, Defendant's fraud devastated his victim's life. *Id.* at 6. The Government notes Mr. Doe, who is on disability benefits, lost a substantial portion of his retirement savings as result of Defendant's actions. *Id.* at 6. The Government also notes Defendant's devasting scheme was ongoing and systematic for a period over two years. *Id.* at 6. The fraud underlying the instant offense was well thought out, extensive, and cruel. *Id.* at 6.

The Government's Memo also argues both general and specific deterrence militate in favor of a lower-range Guidelines sentence. *Id.* at 6 (citing 18 U.S.C. § 3553(a)(2)). The Government maintains this sentence would send a powerful message: the United States does not tolerate those who defraud others out of their hard-earned life's savings. *Id.* at 6. According to the Government, it is also warranted because the Defendant, since being arrested for the instant offense, has

committed new crimes and has failed to follow the orders of this Court and the directions of Pretrial Services. *Id.* at 6 (referencing PSR ¶¶ 2-4, 46-47).

The Defendant has failed to take any steps in more than a year to make the victim whole. On this, the Government notes Defendant has not paid any of the restitution or administrative forfeiture agreed to in the Plea Agreement nor has he paid the full forfeiture amount of $275,500 and full restitution amount of $224,500, which he agreed to do by this sentencing. *Id.* at 6.

Lastly, the Government argues that the history and characteristics of Defendant justify a serious custodial sentence. *Id.* at 7 (referencing 18 U.S.C. § 3553(a)(1)). Although the Government recognizes the negative impact Defendant's adolescent trauma and longtime alcohol abuse have had on him as outlined in PSR ¶¶ 54, 63-66, 95, in the Government's view, these are mitigating factors which might warrant a custodial sentence at the low-end of the Guidelines range but fail to justify a downward variance under the 18 U.S.C. § 3553(a) factors. *Id.* at 7.

Probation takes a different view. Probation's Recommendation at 1. Probation argues a departure from the Guidelines range is warranted here and instead recommends the following sentence: 16 months custody; an Order of Restitution in an amount of $224,500 owed to the victim, due immediately and payable at a rate of $25 per quarter while in custody, and at a rate of 10% of gross monthly income while on supervised release; 2 years Supervised Release with special conditions; and a $100 mandatory special assessment. *Id.* at 1-2.

Probation cites the trauma Defendant experienced as the result of the death of his father and his lengthy history of excessive alcohol consumption. *Id.* at 3 (noting that Defendant used alcohol to self-medicate in dealing with the trauma of his father's death, which, up until this point, has gone largely untreated for Defendant's adult life).

Defense agrees with Probation that a departure from the Guidelines range is justified in this instance. Though, the Defense asks the Court to make an even greater variance from the recommended range. Def. Mem. at 2. In fact, the Defense urges the Court to impose a sentence largely avoiding incarceration. *Id.* at 3. The Defense has asked the Court to impose any one of the following: a sentence of five (5) years of probation pursuant to 18 U.S.C. § 3561(c)(1) and PSR ¶ 85; a sentence of intermittent (weekends) in custody, or a halfway house; [1] or a sentence that commits Defendant to a halfway house as a condition of probation or supervised release per U.S.S.G. § 5F1.1.

The Defense makes this request for a number of reasons. First, a sentence that minimizing imprisonment would better balance the aims of sentencing, namely rehabilitation, retribution and deterrence. *Id.* at 3 (referencing 18 U.S.C. § 3553(a)(2)(D) (requiring a sentence with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."); and 18 U.S.C. § 3553 (a)(5)). The Defense argues Defendant has been drinking since he was 14 years old, when he witnessed his father fall to his death from the roof of his family home. *Id.* at 2. Defense notes further Defendant gained sobriety for the first time in January 2020. *Id.* at 3; PSR ¶ 66. Since then, Defendant has made significant strides towards rehabilitation; according to the Defense, now attending Alcoholics Anonymous and has completed court-mandated intensive therapy. *Id.* at 3. Accordingly, the Defense argues the best way for the Court to achieve the aims of sentencing is to impose a sentence permitting Defendant to work, earn money, and repay the victim of his crime in the most efficient manner. *Id.* at 3.

---

[1] Intermittent confinement may be imposed as a condition of probation during the first year of probation. 18 U.S.C. § 3563(b)(10). It may be imposed as a condition of supervised release during the first year of supervised release, but only for a violation of a condition of supervised release in accordance with 18 U.S.C. § 3583(e)(2) and when facilities are available. Defense Sentencing Memorandum ("Def. Mem.") at 3, n.1, ECF No. 56 (referencing 18 U.S.C. § 3583(d)).

The Defense asks the Court to depart from the Guidelines range in order to avoid a sentence that would constitute excessive deterrence. *Id.* at 3. The Defense maintains because Defendant's alcoholism and childhood trauma were the driving factors behind his criminal behavior, and because Defendant has demonstrated a commitment to addressing these issues and to prioritizing his family, it is doubtful more incarceration is needed to deter Defendant from engaging in more criminal behavior. *Id.* at 3. The Defense argues, while Defendant still struggles with alcoholism, he has completely ceased involvement in the financial trading that led to his crime. *Id.* at 4. The Defense also offers letters from the Defendant, his wife, and his mother arguing the Defendant is determined to remain sober and is committed both to his family and to making amends. *Id.* at 3. The Defense also cites statements by the Sentencing Commission, which recognize non-incarcerating sentences may more effectively address a defendant's criminogenic tendencies. *Id.* at 5 (referencing Application Notes to U.S.S.G. §§ 5C1.1 and 5H1.3 (the Sentencing Commission's treatment-driven policy statement entitled "MENTAL AND EMOTIONAL CONDITIONS")).

Defendant argues other factors further reduce the efficacy of prison, including the likely deportation of the Defendant, and note the Defendant is a first-time fraud offender, making the likelihood of recidivism for the crime being punished almost nil. *Id.* at 3-4. Lastly, the Defense argues the applicable statutory provisions and Sentencing Guidelines both express a need for effective treatment of the Defendant. And, given Defendant's characteristics, namely his alcoholism, and the nature of the offense—financial fraud driven by alcoholism—the Defense believes a departure from the Guidelines range is warranted. *Id.* at 5-6.

**E. Pertinent Policy Statement(s) of the Sentencing Commission**

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5). The Court finds no policy statement pertinent to Defendant's sentencing. None of the parties to this sentencing proceeding advance a policy statement pertinent to Defendant's sentencing.

**F. The Need to Avoid Unwarranted Sentence Disparities**

The sixth § 3553(a) factor requires the Court to address "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

**G. The Need to Provide Restitution**

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). For the reasons set forth above, this Court orders the Defendant to pay restitution in the amount of $224,500.

**CONCLUSION**

A sentence of 30 months of incarceration, 2 years of supervised release with special conditions, restitution in the amount of $224,500, forfeiture in the amount of $275,500 as agreed to in the Plea Agreement, and a $100 mandatory special assessment is appropriate and comports with the dictates of § 3553. This sentence is consistent with, and is sufficient but not greater than necessary to accomplish, the purposes of § 3553(a)(2).

The Court expressly adopts the factual findings of the Presentence Investigation Report and the addenda thereto, barring any errors contained therein, to the extent they are not inconsistent with this opinion.

SO ORDERED.

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: February 9, 2023
      Brooklyn, New York